Ron, this is the third case of the morning called 213-0825. King's Health Spa, Inc. v. Village of Downers Grove Massage Business Commissioner and their complaint against ACES Spa. On behalf of the Appalachian King's Spa, Mr. J. Mark Vitinich. On behalf of the Village of Downers Grove, Mr. John E. Murphy. And on behalf of ACES Spa, Mr. H. Sean Henry. Okay. Both sides ready to proceed then? Or I should say all three parties ready to proceed? You may proceed when you're ready then. Good morning. The issue before you in this case is fairly straightforward. Not fairly straightforward, it is straightforward. The court is being asked to decide whether a single violation of the Downers Grove Village Ordinance by a massage business employee justifies the revocation of the massage business license, whether there's no evidence of any prior violation by the licensee of any village ordinance, and whether there's no evidence that the ownership or management of the licensee was complicit in or had knowledge of the unlawful activities of its employee. And it's submitted to the court that given the facts of this case and the established precedent, the court is compelled to find that there was no justification for the revocation, and the revocation under the facts of this case was clearly erroneous. Your client knew that if there was a single violation, he was subject to having his license revoked, correct? Judge, it's clear in the- I mean, everybody knew. He knew it. It was in the village ordinance, yes. So to the extent that he's charged with knowing the village ordinance, that's correct. The more compelling issue, though, is whether or not in this particular case the licensee knew that his employee was violating the village code. I'll concede that the code authorizes revocation. What I would not concede is that revocation was the appropriate sanction in this case. What's the standard of review on that issue? It's clearly erroneous. Why is that? Why is it not at abuse of discretion? Because it's a mixed question of why. And the Kohler case, I think, cited in the brief, is fairly clear, and I don't believe there's any dispute that in this case the standard review was clearly erroneous. The facts, Your Honors, are largely undisputed with respect to the revocation. The case was contested. The sufficiency of the evidence adds to the violation. I'm not raising that issue before the court. The issue is strictly whether or not the sanction was justified under the facts. What about, you know, we reviewed the decision of the commissioner, correct, the hearing officer? Yes. But Judge Gibson's comments about when he compared the sanction in Ace to the sanction in Kings, he commented on the level of sophistication, going out, looking in the parking lot, making sure it's not a cop. Isn't that relevant to the sanction? It would be if the evidence supported the inference that Judge Gibson drew. You carefully read the transcript. You've got Sergeant Budd, who's 150 yards or feet away from the establishment. He testifies that he sees one or three women come out. He can't be sure because he can't identify them. The first two women that come out, whether it be the same or different women, don't go anywhere near the car. So, really, they are of no important. The fact that they came out of the business, they're only out for an interview. He does testify that the third woman that comes out goes over to the car and apparently looks into the car. Now, you consider that testimony in light of Sergeant Lowe's testimony, where Lowe said that about ten minutes before the police officers were going to enter the establishment for some sort of prearranged time, Sam Miller leaves the massage room, and she's gone for five minutes. Now, that corresponds to Budd's testimony that a woman comes out and looks into the car. So, Budd can't identify the woman who was out there, and he sees Miller afterwards, and he cannot say that Miller was not the woman that went out there. So, it's entirely plausible and indeed likely that it was Miller that, having received all the information about Lowe's car, left the massage room to check out the car. So, the fact that Miller was the one that Budd saw leave does not indicate or give rise to an inference that management had any knowledge of Miller's legal activity or was in any way complicit. What about the conversations between the person who was eventually charged and the officer who was getting the massage? What about those conversations? Don't they show a level of sophistication that they're checking out the patient? They show that Miller was a sophisticated prostitute, perhaps. Perhaps. But what we can't lose sight of in considering the interaction between Lowe and Miller is that, at the time that Miller makes the proposition, for lack of a better word, for the sex act, she points to the door, a door, which Lowe testified was the door to the management area of the establishment. And she makes a shushing sound, indicating to Lowe to be quiet. Now, the common sense inference from that action, that conduct, was that Miller did not want management, who was behind the door, to know what she was doing. She didn't want management to know what she was doing because management would not approve of it. That's the second inference that you draw from that conduct. So while you may infer that there was some sophistication with Miller by the way she was interacting with Lowe, you can't say that, you can't hold management accountable for that sophistication because there's no tying between Miller's sophistication and management's knowledge or complicity in what she was doing. So based on the evidence, what you have is a solicitation by an employee of King's with no evidence to show that King's was aware of what Miller was doing and no history of this type of conduct by King's, and there'd be no prior violations of any village ordinance in King's background. Was there any evidence offered to show that the owner or operator of King's had taken steps to prevent employees from engaging in prostitution? No, there was no evidence. You presented no evidence, correct? King's at the administrative hearing did not present any evidence. So are you asking us to invoke a rule that it's, as a matter of law, it's improper to revoke a license where there's no prior violations and no showing of knowledge on the part of the owner? I'm not asking you to revoke the rule of law per se that applies to every instance. What I'm asking is that on this particular case, given the evidence that we have before you, that the renovation was inappropriate, it was unduly harsh and clearly erroneous. Based on the facts of this case, there was no evidence of any complicity by King's. The sanctions available are a suspension for 30 days or revocation? Yes, and a fine, or a fine. Those are the sanctions available. But the purpose of the sanctions is to deter the conduct. The village is of the opinion that this was such an egregious offense that revocation is warranted. And in fact, in situations where the revocation is based upon, or the violation of the village code is an illicit sexual act, can never be arbitrary and capricious. Well, it's just not law. It's contrary to the law. You have to examine each violation with the surrounding facts in mind. And here, you're punishing, in essence, innocent people without even showing that they were complicit. You shut down a business. And I say you, I don't mean the court, but I mean the effect is to shut down a business that has been in business for quite some time, based on the record, with no prior violations, based on an act that there's no showing the management was powerless to prevent or had knowledge of. Wait, wait, wait. How is the management powerless to prevent this? Well, as the village has pointed out, the massages, even legal massages, are conducted in private. The management's not there. If they have no knowledge that they're... Well, let's take the other side of the coin. You said you're not asking us, per se, to say that no priors, no other issues, revocation is inappropriate. Well, wouldn't we also be saying then, gee, as long as management doesn't know about it, there can never be a revocation? I mean, isn't that really what you're trying to say? As long as, gee, the owner doesn't know, regardless of whether they have undertaken any steps to prevent these issues, that the license can never be revoked? Or are you, I mean, isn't that really the other side of the coin? Well, basically, the position that I'm advocating here is that you have to look at the circumstances of the case before you. And here you have, the facts of the case are, a sergeant goes in, an elderly woman, an older woman, has a conversation with him, and he has no other interaction with anybody else in the massage business. The only person he interacts with is the sandmiller. How can you infer and shut down a business based just upon that, with no showing that management even had an opportunity to become aware of what its employee was doing? Isn't it implicit in management to know what your employees are doing and kind of know what's going on under your rule? I mean, this isn't Kmart. I mean, this isn't, you know, a franchise in 50 states. It's one or two operations. I mean, what burden does the owner bear here, then? Well, I mean, the owner, I suppose when it hires its individuals, it has to ensure that it's hiring people of integrity and character. But that wasn't done here, correct? No, we don't know that. Well, there's no evidence of it, I'm sorry. There's no evidence of it, correct. That goes to another point. Would you agree that the massage industry or massage business is more easily diverted to the unlawful business of prostitution than liquor establishments? And that goes to comparing the liquor establishment cases to the massage parlor cases. Would you agree? Well, to say that there are more acts of prostitution in massage parlors than there are in liquor establishments, I don't know that I necessarily would agree. How about the United States government, Eric Holder's comments about the massage parlor industries, particularly in the Chicagoland area, being fronts for prostitution and slave trade? Can we take judicial notice that it's been a priority of the federal government to shut down these types of businesses? If there are established prostitution establishments, yes. I believe the federal government has a right to do that, and you can take judicial notice that that is a goal of the federal government. But does King's fall within that umbrella of unlawful massage parlors? You don't have any evidence to suggest that it does. Well, here's the point that Justice Jorgenson raised, and I'm again asking you. This industry, it's well known. I mean, you could go on the Internet, you watch it on TV, you watch press conferences from the United States government targeting this industry and other industries. You are correct. Liquor industries in New Jersey being just rife with prostitution and slave trade. But anybody who gets into the business has to be aware of the risk and take steps to ensure, which would be mitigating if you had presented evidence at the sanctions portion of the hearing to show that your client had taken reasonable steps to ensure background checks, an affirmation, a statement, policies that you would prevent this type of behavior and instead you have nothing in the record. There's nothing in the record. No, but nor is there any evaluation in the record. And the administration. The bottom line is the ordinance doesn't say anything about anyone having to have knowledge. It's just if the violation occurs, these are the potential sanctions. Correct. I don't dispute that. I agree with that. But you're asking us to make a quantum leap based on the equities? Yes. It's not a quantum leap you're on, but just... Quantum is, I suppose, in the eye of the beholder, but let's assume it's a leap. But you're asking us to do that based on equities. This is an equitable case. I'm not arguing what the ordinance says. The ordinance does authorize revocation. Right, and so therefore the only remedy here is some type of equitable remedy because there's nothing that you can point to in the statute to say, you know, the commissioner didn't establish X, Y, or Z. The elements were established. So you're saying based on the equities, the totality of the circumstances and the lack of priors, et cetera, that this was too harsh a sanction? Yes. Is that the bottom line? Yes. Okay. Would you agree that the commissioner, at the time of the hearing, was in the best position to determine what the appropriate sanction was? No, I would not agree. The commissioner didn't hear the evidence, didn't see the witnesses. There were no findings of fact by the hearing officer. So I can't say that, not having seen the witnesses or reviewing the specific findings of fact, that he was in a better position. I don't know that he was in a better position to determine that revocation was appropriate than anybody else that was reading the record. Is there anything in the village ordinance that provides for progressive discipline? No. Not that I recall. Not that I saw. Nothing. It's revocation of 30-day suspension. And that's it. And that's what we had to work with. So my time is up. I give the court his extensions. Thank you. Thank you so much. I place the court in closing counsel. My name is John Murphy. With the court's permission, since I'm appellee, I'm king, an appellant, I'm ace, I think if it's all right with the court, I'll just merge and deal with both issues. If I can perhaps put aside a couple of the issues quickly. The ordinance has a corporate accountability provision. All of these entities are corporations. The purpose of the ordinance, just like the parallel provision in the liquor code, is to prevent management from raising the ostrich defense. Now that's important in these two cases for two reasons. Justice Burkett, to follow up your question regarding King, at that time the charges were pending against the employee. King had an attorney there, a complete no-show otherwise. Essentially it was a lay-down by King. The evidence that was presented would permit a reasonable commissioner to conclude that this employee was a pro. And I don't mean a pro at getting a crick out of the neck. This was a sophisticated prostitute who used sophisticated techniques to do what she could to make sure that John wasn't a copper. That is a reasonable inference. I want to turn to the issue that Your Honor has raised regarding the extent of this case. Your Honor, we are saying that both of these cases, on the record presented, revocation was a permissible sanction by the commissioner given the deferential standard. And I'd like in a moment to maybe give you a mindset, because when we've got these clearly erroneous, arbitrary, unreasonable, they all end up being kind of conclusions. But I want to, as I mentioned in my reply brief in Ace, give the Court perhaps a counterpoint. There's something in the liquor control business called cert training. I don't know if Justice Burkett, you may recall that from your earlier days, where it's required that every year, it's a statute, that requires every year that taverns, bars, and the like, and it's incorporated by ordinances, have training of their bartenders. Here's how you check for IDs. Here's how you recognize somebody who's been over-served and the like. And that's in the context of an open liquor establishment. If we had a record here where I used the term Queen's Health Spa, brought in a corporate representative who has said that for the last seven years, we have had annual training to underscore that you people are massage therapists only. We do not tolerate prostitution. If anybody finds out, if anybody at management finds out that you've done funny business, you're out the door. When you're a municipal lawyer, I get involved in some cases regulating strip bars. What the strip bars have now, Your Honor, believe it or not, is testers, because they don't want the strippers to patronize with the customers. They bring testers in to try to take them out on dates. Let's stick to the record here. I get your point. So if there was a proactive management who said that this person was a renegade, I think that would be a far different record. In King's, there was no evidence whatsoever to permit an inference that this was a management that was proactively inclined. I believe the evidence in Ace, the so-called mitigation evidence, is worse. The manager of the premises, and again, it's a corporation, corporate responsibility, where the individual admitted that he had knowledge of the corporate responsibility, would come to the place once a month to collect money, was next to a complete no-show, didn't do any training of his employees, didn't do any supervision, and indeed didn't take any disciplinary action against this employee until after the prostitution case went to trial in a criminal court. Let me ask you, what was the relevance of Agent Baumann's testimony? Let me rewind to a mistake I made. When Judge Sheen originally remanded the case for more evidence, I took an appeal, and I was wrong. So it went back to the commissioner on remand. And the purpose of Agent Baumann's testimony, from our perspective, is to make an on-the-ground record of the matters which, in part and in brief, we asked the court to take judicial notice of. And that is this essential point, Your Honors. When you have a business where it is very easy to have illegal acts committed, and you have a potential endemic law enforcement and social problem, that, in the view of the village, imposes a level of corporate responsibility on the company. In other words, this whole ordinance is aimed against prostitution, no question. It goes to the policy of the ordinance and the policy supporting the sanction of revocation for even one violation. That is correct. And the hearing officer is not limited to the traditional rules of evidence that would be applied in a criminal case, correct? That is correct. It's almost a modification of those to whom much is given, much is expected. This business has a great deal of freedom because the act is conducted behind closed doors. And as I mentioned, I'm a customer, and I'm not satisfied with that deal. I'm not going to go home and complain to my wife about it. Well, some people would complain that since the cost of these investigations and ferreting out this conduct is so expensive, then the penalties for one violation should be harsher. Is that fair to the business owner? I believe it is, Your Honor, in part because of the difficulty of enforcement. I mean, this case is a perfect example. This was a sting operation that we conducted on the same day, March 31, 2011, both premises. We got a prostitution case in each one. What a coincidence. But the fact that these cases are so hard to make because they're done behind closed doors, that elevates deterrence because good operators won't care about it. It's the only effective deterrence. The only way we can do it is, Your Honor, you know that it takes a lot of time and effort to do these things. You can't use local officers, and you really have to stage it, and we did that. And if it turns out that with all the resources we spent that it turns out to be a 30-day suspension, limited governmental resources will have to go somewhere else, and that would be a crime, Your Honor, because as all of the information that the Attorney General has given in these projects, the women who are performing these services are forced to perform these services. They are victims of this operation. And we need, as a municipality and as a government, to do what we can to make sure that the good operators flourish and that the operators who are either good but may have potential problem employees go after them and that the shady operators stop, get out of downers' wealth. That's the essence of this case, and it's... So you're basically arguing that the equities go the other way. Yes, Your Honor. That we should impose the highest standard, the letter of the law, and the ordinance, that one violation, discretion by the commissioner, 30-day or total revocation. Not just any violation. I think that's... Let me underscore this point. Not just a violation but the violation. Well, let me ask you this. What if the shoe was on the other foot and the evidence was clear that there were violations and there's no contest here that there were violations, but the commissioner only gave a 30-day suspension? Would you be here appealing that decision as an abuse of discretion? I don't think I would have standing to, but I think that discretion is discretion. And if I'm a village attorney and the Fire and Police Commission says he shouldn't be fired, it's only a 30-day suspension? What is the standard of review? Because in your brief, you say the standard is clearly erroneous, but then later say the revocation decision was not arbitrary or an abuse of discretion. We do mention clearly erroneous based on the Kohler case. There are many cases that really, in this kind of environment, that talk solely about the sanction. In Kohler, there was a much greater record of different violations. Your Honor, I just got online and there's a Rule 23 that makes reference to, if it's a sanction case only, it's got to be shown that the sanction was arbitrary, unreasonable, that kind of standard. Here's what I would suggest to the court as a potential way to balance these things. You know, in cases dealing with constitutionality of municipal ordinance and their statutes, the question is, is it rationally related to a legitimate governmental purpose? In this case, maybe the best way for a court to analyze something like this, given this type of business, is the sanction of revocation on the record rationally related to a legitimate governmental goal. So rationally, the essential governmental goal here is preventing these things from degrading. A tough sanction, when there is a core violation, is rationally related to that governmental goal. On the other hand, if we've got bad wiring, we're late on paying our fees, a draconian sanction, maybe even a 30-day sanction or revocation, would not be rationally related to a legitimate governmental goal. Why? Because any business can have bad wiring that needs to be fixed. So I think that, Your Honor, is a suggested way to look at it. And I agree, it would seem, whether it's clearly erroneous, we're not dealing with any fact issues here. It's really, I guess it trends more towards, is the sanction itself arbitrary and capricious? From your earlier comments, it sounds like you would agree that, had there been evidence of extensive practices, procedures, and employment agreement, signed employment agreement, acknowledging that if you violate one time, you're fired, that in that situation, maybe revocation would have been an abusive discussion. I agree with that, provided the procedures in place were pre-incident. Right, that's what I'm talking about. Not somebody who, after the fact comes in and says, oh, I just found this out, I'm changing things now. That's correct. Especially not given this business, not with the risks involved, not with the potential for abuse. The prophylactic, that's the word he used in this case, but those procedures have to be in place at the time of the occurrence. That completes my argument. I think Your Honor would understand our point in this case. It's a very important case for Downers Grove. It's taken us three years to get here. It is, I am sure, an important case for all municipalities. I just do municipal law, and I think in terms of abuse of discretion, the famous Launius case out of Des Plaines, that was a good cop with a good record who left his post when there was a flood, and the Supreme Court upheld the termination. And I think in a way there's an analogy here that that decision is rationally related to a legitimate governmental goal. The goal is to make sure that police officers hold the fort at the time of an emergency. It seemed like a rough sanction, but it's within, Your Honor, what I call the corral of reasonableness, where if, just like in the Launius case, if a sanction of revocation for something, core prostitution violations in a business where that's the biggest risk is committed, if a decision of a commissioner falls within that corral, and Justice Burkett, to follow up on your point, if the revocation falls within what Your Honor might believe is within that corral, if it falls within this part or within that part, a 30-day or fine, at that point, once Your Honors are convinced that the sanction, given all of these policy matters, is within that corral, with respect as far as Your Honors are concerned, you're done. Because at that point, the court's responsibility is to defer to the agency. If there are no further questions, I thank the Court for your time. Thank you. Thank you. Good morning, Your Honors. May I please the Court show on camera my case file? As Mr. Murphy and Mr. Buchanan pointed out, I think by this time the issue or issues have been narrowed down. The ultimate issue is even with compelling mitigating factors from the licensee, that prostitution is so egregious that regardless of how compelling the mitigating evidence is, regardless of whether the village rebutted the mitigating evidence, whether the village had any aggravating evidence per se, the licensee loses his or her license. And we believe that that is, that notion, that principle is fundamentally wrong. The mitigating evidence here was that the owner, Mr. Kim, no relation, right? No relation. He was unaware. That was one of the mitigating evidence. What was the other mitigating evidence? There was testimony at the hearing that he had hired a manager. Because of his health, he was not able to be at the business premises on a day-to-day basis. And so therefore, he hired a manager. And through the manager, he instilled, admonished all the new therapists that were hired, that they are to conduct themselves within the parameters of legality, not to engage in any improper conduct, that in the event that there's any improper advances by the customers, that the therapists are to right away inform the management. He had no written policies or employment agreements, though, correct? That is correct. One of the things that this Court should consider in somewhat addressing that issue is that unlike the waitresses at a bar, bartenders, pole dancers, massage therapists are licensed by the State of Illinois. I have personally worked on several licenses myself for other therapists, and the requirements are very rigorous. So by virtue of having these therapists go through the system to make sure that they have no background, that they have good moral character, I think is sufficient for the time or at the time that individual is hired. And also, I submit to the Court that in the event there were any problems in terms of background or moral issues, the village would also not have allowed these therapists to work as a therapist in the village of Downers Grove. So there are several steps or checks that the government entity, both in the local level and the state level, that ensures, of course, no checks or policy will completely eliminate any wrongdoing. But by virtue of having these checks and policies in place, I think it greatly reduces the possibility of the therapist engaging in illegal acts. And with that, I think Mr. Kim believed that there was no need to take the additional step, especially in light of the fact that for 12 years when he owned the business, not one infraction, not one violation of any law. So that is part of the essence of this case. Had there been stings? Was there any indication that they had even conducted an investigation at ACES in the past? There is no evidence that there were previous stings. So the first time they did a sting, they caught a prostitute? It seems as though that that's what happened based on the record. It's, as your honors know, unlikely that that was the first sting engaged in by the village. But I'm not going to argue that they have. They don't go give you a certificate that you've passed the sting. Exactly. So I think when deciding whether Mr. Kim was responsible or not in supervising his employees, I think one has to look at the circumstances, the total circumstances, whether other entities have already performed certain checks and investigations. You know, that's all true. That may be true. I take you, I mean, I think you are correct. The state license is the state license. But that has not resolved the problem that these industries, this particular industry, is rife with prostitution. Yeah, I agree. And then I will get into that issue at this time then. First of all, Mr. Baumann's testimony, we have made the argument is irrelevant. And as your honor indicated earlier. It's not like a criminal case, though. It goes to the policy side for the sanction. Understood. But nevertheless, it's still irrelevant because Mr. or Agent Baumann's testimony strictly and narrowly dealt with the investigation of human trafficking and slavery. And there's evidence in the record that Ms. Foster, the therapist for Ace, was a 58-year-old United States citizen. So whether for the purpose of the aggravation or just the general policy, I think Agent Baumann's testimony was irrelevant. And the circuit court agreed. Does she instruct Agent Baumann's testimony for that reason? Isn't his testimony, though, with respect to, it didn't rebut any mitigation presented by Mr. Kim. But it did go to the necessity of strict punishment for these violations because of the threat that these businesses pose for human trafficking and quote unquote prostitution. You don't know who is going to violate the law. You know, there's no crystal ball for the village. But they enact tough ordinances to prevent this type of activity. And the ACEBA acknowledges that policy, given the level of these activities in recent years. But as your Honor pointed out earlier, just because some industry or some act becomes more prevalent in violating law does not necessarily make the penalty or sanction significantly higher than what other situations would warrant. And that's exactly what happened here. The village makes the argument that it is so much more difficult to investigate spas because these things are done clandestinely inside the closed doors. And I made the argument, and I believe Judge Sheen did not buy that argument. And what he said in the argument that we made was, how is this operation, sting operation, different than investigating a bar or a dance club where the officers have to formulate a plan, come up with backup officers? All this takes time and money. In fact, I would submit to the court that it would be easier to investigate massage parlors than other places. And here's the reason why. If an officer walks into a bar and tries to see if any illegal activity is going on or any perpetrator were approaching and soliciting either sex or selling drugs, there are a lot of people in the bar. It's out in the open. The perpetrator will think twice about stepping up and making the proposal when there are other people around listening in, possibly other undercover officers. Whereas in a spa, there are no restrictions for the perpetrator to offer something illegal. Absolutely none. Yes, Your Honor. Never mind. And also, I would also argue that it would be a lot more expensive to investigate other places, again, because of the danger aspect of it. You hear every day that these drug dealers are carrying weapons, and obviously it's dangerous for the investigating officer, which requires a lot of backup officers for his safety. I've never heard of a case where a prostitute was packing a handgun. So, again, if you look at it from that perspective, it is less dangerous. It does not cost any more money or effort to investigate. And the village is arguing that because of those reasons, the sanction must be all the way at the top without consideration of any mitigating evidence. Going back to your point about the mitigation, Mr. Kim's testimony, that he was operating the business for 12 years or was it 15? 12 years. 12 years. In those 12 years, he was basically, and you mentioned hiring a manager, but basically left everything to the manager. I think after several years. I'm summarizing what you said. Not from the beginning. He was stricken with cancer, although I'm not sure how many years afterwards, but it was not from the beginning. Okay. But in those years that he did operate the business, both on site and then later on with the manager, there was no evidence presented that he enacted any written policies or practices or employment agreements, correct? Nothing written. Okay. That's correct. Thank you. All right. Thank you very much. Do you wish to respond again? Thank you very much. We'll be in recess until 11 p.m.